1

2

3

4

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com

5

6

7

8

9

**BURSOR & FISHER, P.A.**
Joseph I. Marchese (*pro hac vice* forthcoming)
Alec M. Leslie (*pro hac vice*)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: jmarchese@bursor.com
         aleslie@bursor.com

10

11

12

13

**GUCOVSCHI ROZENSHTEYN, PLLC.**
Adrian Gucovschi (*pro hac vice*)
630 Fifth Avenue, Suite 2000
New York, NY 10111
Telephone: (212) 884-4230
Facsimile: (212) 884-4230
E-Mail: adrian@gr-firm.com

14

*Attorneys for Plaintiff*

15

16

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

17

18

19

20

21

22

23

24

25

EFREN RAMOS, individually and on behalf of all other persons similarly situated,

Plaintiff,

v.

THE GAP, INC.

Defendant.

Case No. 4:23-cv-04715-HSG

CLASS ACTION

**FIRST AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

26

27

28

Plaintiff Efren Ramos ("Plaintiff") brings this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against The GAP, Inc. ("Defendant" or "GAP"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a class action lawsuit brought against Defendant for aiding, agreeing with, employing, or otherwise enabling Bluecore, Inc. ("Bluecore") to intercept the contents of its marketing emails sent to customers and prospective customers, in addition to other information.

2.      Defendant, as part of its business, sends marketing emails to customers and prospective customers which, among other things, display hyperlinked images of certain of Defendant's products (such as a particular shirt), and hyperlinked text, which are designed to entice the customer or prospective customer to click on the hyperlinked image or text to be navigated to Defendant's website, where the customer or prospective customer can purchase the advertised product (or other products). Defendant sends the marketing emails at issue from its email domain: bananarepublicfactory@email.bananarepublicfactory.com (the "Emails").

3.      However, Defendant and its customers or prospective customers are not the only ones privy to the content of the Emails. Unbeknownst to Plaintiff and Class Members, Bluecore wiretaps and intercepts Plaintiff's and Class Members' email communications with Defendant. Bluecore does this by embedding spyware software into Defendant's Emails to customers and prospective customers, namely invisible pixels and URLs. The URLs and pixels are connected to the images that the customer or prospective customer sees in the Email such that when a customer clicks on the image within the Email to navigate to Defendant's website, the URL is transmitted to Bluecore, which corresponds to the image within the Email. Said another way, Bluecore receives the contents of the Email because the URL it generates corresponds to a particular image that is being displayed to the customer within the body of the Email. Because the unique URLs are associated with different parts of the email, Bluecore knows which

particular images Plaintiff and Class Members clicked on and what they received in return from Defendant.  Bluecore generates a similar URL for hyperlinked text within the body of the Email which, when clicked, allows Bluecore to know exactly what text within the body of the Email that Plaintiff and Class Members received and clicked on.  Both the hyperlinked images and text, which are transmitted to Bluecore through its unique URL, are contents of the communication between Defendant and Plaintiff (and Class Members).

4.     Bluecore's invisible pixels and URLs function to inform Defendant of exactly when a customer opens one of its Emails along with the exact images and words that a consumer clicked on before being routed to Defendant's website, https://bananarepublicfactory.gapfactory.com/ (the "Website").

5.     Bluecore also aggregates the data received from the wiretapped emails to create highly detailed user profiles which permit Defendant to improve its marketing efforts by obtaining user-specific information regarding the user's interactions with the Emails and the Website, among other data.

6.     Bluecore uses the data obtained from the wiretap to improve its own machine learning and artificial intelligence models—which it then touts to the public to attract additional clients for its software products.

7.     The electronic communications of users, through the Emails and Website, are routed through Bluecore's servers and are used by Bluecore to, among other things, secretly observe and record the interactions of Defendant's customers when they open and/or click on the content (*i.e.* hyperlinked images and/or text) of the Emails and the landing pages of Defendant's Website in real-time.  The software functions to effectively permit Defendant and Bluecore to stand over the shoulder of Plaintiff and Class Members to view what emails they choose to open, read, engage with, reply to, as well as how they engage with those emails.

8.     Bluecore maintains a copy of the Emails in its own servers and therefore can track every recipient's open and click rates, which it displays to Defendant through Bluecore's interactive platform.  After extracting the metadata from the Emails (including the specific words

and images embedded within the Emails' design), Bluecore reroutes Plaintiff and Class Members to the Website, where it continues to track Plaintiff's interactions with the Website.

9.    Plaintiff received a marketing Email from Defendant and interacted with the same by clicking on a hyperlink embedded in the body of the Email.  Plaintiff's interaction with the Email was wiretapped by Bluecore with Defendant's assistance such that unbeknownst to Plaintiff, Bluecore received (through its unique URL), the contents of Plaintiff's communication with Defendant.

10.    The nature of Bluecore's licensing agreement with Defendant is such that Defendant "aids, agrees with, employs, or conspires" to permit Bluecore to read, attempt to read, and/or use the communications of Plaintiff and the Website's users without their consent, thus violating the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 631.

11.    Plaintiff brings this action on behalf of himself and all persons who received Defendant's Emails, and whose electronic communications with those Emails were intercepted or recorded by Bluecore.

## PARTIES

12.    Plaintiff Efren Ramos is a California resident and citizen who resides in Alameda County, California. Mr. Ramos received and interacted with Defendant's Emails on multiple occasions from his computer while in California.  One such instance was in or about March, 2023. When Mr. Ramos opened the Emails, Bluecore intercepted, in real-time, the contents of Plaintiff's communication with Defendant because by embedding a unique URL behind the hyperlinked text and images, when Plaintiff clicked on a hyperlink, Bluecore could identify the exact image or text that Plaintiff clicked on (*e.g.*, a specific shirt), which were contents of the communication between Defendant and Plaintiff.  Bluecore also intercepted additional information, including the time, date, device type, geolocation, and other information attributed to Mr. Ramos's online activity,  including the fact that he opened the Email.  Even after clicking on the Email's content, Bluecore continued to intercept Mr. Ramos's communications with Defendant's Website, such as the web pages (corresponding to the specific shirt in the Email)

viewed by Plaintiff.  At all material times, Mr. Ramos was unaware that his engagement with the Emails, the Website, and other electronic communications were being intercepted in real-time by Bluecore (with the aid of Defendant), nor did Mr. Ramos consent to the same.

13.     Defendant The GAP, Inc., is a Delaware corporation with its principal place of business at Two Folsom Street, San Francisco, CA 94105.  Defendant develops, owns, and operates the email domain bananarepublicfactory@email.bananarepublicfactory.com, as well as the Website https://bananarepublicfactory.gapfactory.com/.  Defendant contracted with Bluecore, which permitted Bluecore to intercept communications between Defendant and its customers and prospective customers via the Emails and Website.  Defendant sends an average of over 7 Emails per week to its customers and prospective customers—twice the average amount of emails sent by other e-commerce companies.[1]

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action where the aggregate claims for all members of the proposed class are in excess of $5,000,000.00, exclusive of interests and costs, there are over 100 members of the putative class, and Plaintiff, as well as most members of the proposed class, is a citizen of a state different from Defendant.

15.     This Court has general jurisdiction over Defendant because Defendant maintains its principal place of business within this District.

16.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because Defendant resides in this District.

## FACTUAL BACKGROUND

### I.     Overview Of Bluecore's Wiretaps

17.     Bluecore develops, owns, and licenses mail tracking software for e-commerce

---

[1] https://www.mailcharts.com/companies/banana-republic-factory-email-marketing (last accessed October 21, 2024).

businesses.  Bluecore's software helps companies optimize their email marketing campaigns by tracking and analyzing their email performance, segmenting and personalizing emails to their audience, and automating their email workflows.  In short, Bluecore embeds spyware within the body of marketing emails (including by creating unique and invisible URLs embedded in images and text which, when clicked on, transmit the contents of the communication back to Bluecore). Bluecore's software allows e-commerce companies (such as Defendant) to circumvent current data safeguards while allowing them to gain valuable data from unsuspecting customers.

18.     One of Bluecore's features is its email link tracking software.  Bluecore's link tracking software "provides [clients] with a detailed view of how customers are engaging with [their] email templates…[to] improve email performance going forward."[2]



19.     To accomplish this task, Bluecore embeds an invisible URL link within the clickable images and words included in the body of an email.[3]  These invisible URL links are unique to each recipient of an email campaign—allowing Bluecore to correlate email behavior with its intended recipients. When the recipient of an email clicks on a trackable URL link, the recipient is directed to Bluecore's servers, permitting Bluecore to capture a large amount of data, such as the

---

[2] https://help.bluecore.com/en/articles/3616045-link-tracking (last accessed October 21, 2024).
[3] https://help.bluecore.com/en/articles/4580017-email-visual-template-editor-navigation-and-images (last accessed October 21, 2024).

recipient's email address, as well as email open rates and content click rates.[4]  The invisible URL links allow Bluecore to identify the particular contents of the email the customer or prospective customer clicked on, as well as which specific customer clicked on it.

20.     This allows Bluecore's customers, such as Defendant, to track the performance of their email marketing campaigns.  Bluecore's software contains a tool called "Email Editor" which designs the emails sent to the consumer and embeds the invisible URLs so that Bluecore can intercept the consumer's interaction with the email and the contents of the communication. Bluecore then aggregates the data and provides it in a dashboard available to its customers (such as Defendant):



21.     It is only after Bluecore intercepts, aggregates and analyzes the contents of the Emails that it re-directs the recipient to the web page they originally sought to navigate to (*i.e.* the exact subpage of the precise items being clicked on within the emails).

[4] https://help.bluecore.com/en/articles/4038356-bluecore-site-analytics (last accessed August 30, 2023).

1
2
3
4
5
6
7
8
9

22.    The end landing webpage, however, does not end Bluecore's involvement in the process. After a subscriber ends up on the landing page of a website (*e.g.*, the product catalog displayed in an email), Bluecore uses JavaScript and other persistent cookies installed in the hosting website to monitor customers throughout their purchase journey.[5]  Having done so, Bluecore unifies all of the previous anonymous visits of those customers to the hosting website to create a comprehensive user profile—including their interests, purchase intent, and other personal information. With this information in hand, Bluecore then deploys its proprietary algorithm to send personalized emails—such as when a customer abandons a website after placing a product in a purchasing cart.[6]

10
11
12
13
14
15
16
17
18

23.    Bluecore maintains a symbiotic relationship with its clients. Beyond providing the services described above for a fee, Bluecore further enhances its own software capabilities (and thereby attracts new clients) by aggregating the data from its clients' customers: "Bluecore's retail data model processes 500M products and attributes, 5B shopper identities, and 300B behaviors — all of which change and grow as powerful predictive models analyze data for best results."[7]  Bluecore also periodically issues industry reports based on the data it processes on behalf of its clients: "[i]n the 2022 Retail Ecommerce Benchmark Report, Bluecore analyzed over 35 billion campaigns and shopper data from global ecommerce brands to demonstrate how shoppers are influenced throughout their lifecycle."[8]

19

**II.    Detailed Breakdown of Bluecore's URL Tracking and Pixel Email Open Tracker**

20
21
22

24.    As an email tracking software provider, Bluecore acts as covert middleman between Defendant and its customers—quietly extracting data from the Emails while escaping the cookies firewall enacted by most online browsers.

23
24
25
26
27
28

---

[5] https://help.bluecore.com/en/articles/3917362-bluecore-site-targeting-rules (last accessed October 21, 2024).

[6] https://www.bluecore.com/blog/types-triggered-emails/ (last accessed October 21, 2024).

[7] https://www.bluecore.com/solutions/increase-repeat-purchases/ (last accessed October 21, 2024).

[8] https://www.bluecore.com/resources/bluecore-2022-retail-ecommerce-benchmark-report/ (last accessed October 21, 2024).

25.     The first step in the operation of Bluecore's software is email creation.  Emails embedded with Bluecore's spyware are created either by Defendant's marketing team or Bluecore, who create the design and layout of the Email (including text, images, buttons, and other visual assets).  Then, the Emails are uploaded to Bluecore's Visual Template Editor ("VTE"), which functions to embed unique URL trackers into the contents of the Email such that Bluecore can intercept Plaintiff's and Class Members interactions with the Email in real time.

26.     The second step is the Emails are scheduled for sending through Bluecore's platform. Bluecore sends the emails on behalf of Defendant by integrating Defendant's email server provider ("ESP") or using Bluecore's own ESP partner.[9]

27.     The third step is that once the Emails are sent, Bluecore retains a visual copy of the Emails and receives analytics of customer engagement in real-time, including URL clicks (which transmit the contents of the recipient's interaction with the Email because the URLs are merely proxies for the specific image or words clicked on by the recipient) and email opens. Bluecore hosts this information in its servers which it then presents to Defendant through Bluecore's interactive platform.

28.     A URL (Uniform Resource Locator) is the address used to access resources on the internet. It consists of several parts:[10]

- Scheme: Specifies the method used to access the resource (e.g., http, https).
- Domain Name: The address of the server where the resource is hosted (e.g., www.example.com).
- Path: The specific location of the resource on the server (e.g., /page1.html).

---

[9] https://help.bluecore.com/en/articles/9311622-bluecore-email-service-provider-setup (last accessed October 21, 2024).

[10] https://www.concretecms.com/about/blog/devops/breaking-down-the-parts-of-a-url (last accessed October 21, 2024).

- Query Parameters: Additional contextual data passed to the server, usually following a question mark (?) and separated by ampersands (&).



29.    To intercept the contents of the Email communications between Defendant and Plaintiff (and Class Members), Bluecore embeds detailed URL links that include specific parameters to capture specific data about user interactions.[11] When a user clicks on a link anchored to any clickable content in an email (such as a hyperlinked image or words), Bluecore appends tracking parameters to the URL.  These parameters include granular information such as the email campaign name, the user's name or email, and other relevant details.[12]

30.    For example, when a retailer like Defendant sends an email with a catalogue of shirts (each of which is linked to the webpage containing that specific article of clothing), the URL behind a specific shirt might look like this:

---

[11] https://help.bluecore.com/en/articles/3616045-link-tracking (last accessed October 21, 2024).

[12] https://help.bluecore.com/en/articles/3602151-default-tracking-parameters (last accessed October 21, 2024).

"https://www.example.com/product/12345?utm_source=email&utm_medium=campaign&utm_campaign=fall_sale&utm_content=cta_button&user_id=abc123."  Broken down, this URL includes the following:

- **Domain**: https://www.example.com

- **Path**: /product/12345

- **Parameters**:

    o   utm_source=email: Indicates the source of the traffic, which is an email.

    o   utm_medium=campaign: Specifies the medium, in this case, a campaign.

    o   utm_campaign=fall_sale: Names the specific campaign, here "fall_sale".

    o   utm_content=cta_button: Identifies which part of the email was clicked, in this case, a call-to-action (CTA) button.

    o   user_id=abc123: A unique identifier for the recipient, allowing you to track which specific user clicked the link.

31.     When an email is sent through Bluecore, all of the clickable parts of the email will contain this long-string URL by default so that Bluecore can capture, monitor, and display the click rate of the emails' content.[13]  In most instances, Bluecore swaps these long URL and truncates them in order to reduce the data size of the emails.[14] As an example, Bluecore takes long descriptive URLs such as https://www.bluecore.com/blog/back-to-school-shopping-marathon/ and replaces it with "Trk.b.bluecore.com/abcdefgh."[15] Although the latter URL link does not appear to have any descriptive characters, it is synonymous with the long-string URL as " direct shoppers to the same link."[16]  The pictures below illustrate how these URL links are created through Bluecore's interface:

---

[13] https://help.bluecore.com/en/articles/9298301-allow-list (last accessed October 21, 2024).

[14] https://help.bluecore.com/en/articles/4702215-email-clipping (last accessed October 21, 2024).

[15] Id.

[16] *Id.*

1
2
3
4
5
6
7
8
9
10
11
12
13

 

14    Figure 1 (Appending URL links within emails[17])    Figure 2 (Shortening the URL links)

15        32.    In addition to its URL tracking, Blucore also embeds an invisible tracking "pixel at

16    the top of the email to provide a more accurate open rate and CTOR in Bluecore."[18] When an email

17    containing Bluecore's pixels is delivered to the recipient's inbox, the tracking pixel remains

18    inactive until the email is opened. When the recipient opens the email, their email client requests

19    the image from Bluecore's server. This request logs the open event.

20        33.    Bluecore's email tracking hosts the captured data within its platform where it

21    provides performance reports and visual representations of how consumers interacted with a

22    particular email. Each tracked link is numbered and mapped to its location within the email. This

23    helps determine which parts of the email (including images) are receiving the most engagement:[19]

24
25    _____
    [17] https://help.bluecore.com/en/articles/4580099-email-visual-template-editor-button-and-multi-
26    column-layout (last accessed October 21, 2024).
    [18] *Id.*
27    [19] As Bluecore explains on its website "Each link is given a number on the left-hand side of the
    screen. The number coincides with a visual representation of where it is located in the email. **Link**
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

34.    Bluecore is able to present this information on a specific recipient level:[20]



35.    After extracting all of the above-referenced information, Bluecore redirects its URLs to the final destination of the object that was pressed on. This process happens in real time and is virtually unnoticeable. An illustration of how Bluecore completes this is depicted below:

---

**Name:** This is populated from the link structure, between the domain and the tracking parameters. For example, http://www.bluecore.com/womens is displayed as /womens. **Clicks:** The number of clicks per link of the identified section. **Unique Clicks:** An aggregated total of how many times the link is clicked by individual users." https://help.bluecore.com/en/articles/3616045-link-tracking (last accessed October 21, 2024).

[20] https://help.bluecore.com/en/articles/3549810-customer-360-overview (last accessed October 21, 2024).

1
2
3
4
5
6
7
8
9
10



11    36.    The end landing webpage, however, does not end Bluecore's involvement in the

12   process. After a subscriber ends up on the landing page of a website (*e.g.*, the product catalog

13   displayed in an email), Bluecore uses JavaScript and other persistent cookies installed in the

14   hosting website to monitor customers throughout their purchase journey.[21] Having done so,

15   Bluecore unifies all of the previous anonymous visits of those customers to the hosting website in

16   order to create a comprehensive user profile—including their interests, purchase intent, and other

17   personal information. With this information in hand, Bluecore then deploys its proprietary

18   algorithm to send personalized emails—such as when a customer abandons a website after placing

19   a product in a purchasing cart.[22]  In addition, Bluecore aggregates this data with the user's previous

20   anonymous visits to the website (linked to the device used to open the email) to create a highly

21   detailed personal profile of that customer—all of this without their knowledge or consent.[23] [24] [25]

22

23

24   [21] https://help.bluecore.com/en/articles/3917362-bluecore-site-targeting-rules (last accessed
     October 21, 2024).

25   [22] https://www.bluecore.com/blog/types-triggered-emails/ (last accessed October 21, 2024).

26   [23] https://www.bluecore.com/solutions/identify-and-convert-shoppers/ (last accessed October 21,
     2024).

27   [24] https://www.youtube.com/watch?v=LMLcwKf_C08 (last accessed October 21, 2024).

28   [25] https://www.youtube.com/watch?v=VTkbH7asNdQ (last accessed October 21, 2024).





//

//

//

//

37.     On its website, Bluecore confirms that it collects the data outlined above:[26]

**Web Beacons**

Bluecore may process Personal Information using digital images called web beacons on our Site or in emails. Web beacons are used to manage cookies, count visits, and to learn what marketing works and what does not. Web beacons are also used to determine if a user opens or acts on a Bluecore email message.

**Cookie and Related Technologies**

Bluecore tracks users by their email address and 1st party cookie ID. Bluecore maps all on-site behaviors and email engagement activity to the email address and cookie ID in order to create a single unified user view. Bluecore can collect as much data as is generated by user activity. Bluecore may also ingest purchase history, email database and its clients' customer data to enhance the product's performance.   Bluecore uses service providers / data processors to process the Personal Information it collects. These include Google, ExaVault, SendGrid, JustUno and Facebook.

38.     To summarize, Bluecore embeds hidden URL links within the clickable images and words of an email (*i.e.*, the email's content because the hidden URL corresponds to the specific hyperlinked image or words contained within the body of the email). When a user clicks on the content of the email to be directed to a particular webpage within a website (*e.g.*, a specific shirt showcased in the email), Bluecore immediately intercepts the contents of the communication *and* gathers valuable data by receiving the full detailed URLs (including the exact subpage of the precise items being purchased or viewed), and through its use of email trackers (including pixels and URL tracking parameters), correlates any engagement with the user's personally identifiable information along with their device type, geolocation, IP address, email provider, and browser used. By causing the email service providers to divulge the detailed URLs within the emails along with the invisible email pixels, Bluecore is able to deanonymize the private browsing history of those recipients with the website to create a highly detailed personal profile of that customer—all of this without consumers' knowledge or consent.

**III.     GAP Enables the Interception of Communications On its Emails and Website**

39.     Defendant owns and operates the email domain bananarepublicfactory@email.bananarepublicfactory.com as well as the website https://bananarepublicfactory.gapfactory.com/.

---

[26] https://www.bluecore.com/privacy-policy/ (last accessed October 21, 2024).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

40.     Defendant enabled, allowed, or otherwise procured Bluecore to intercept communications between Defendant and its Email's recipients and Website's visitors through a contractual arrangement. Defendant procured Bluecore to embed Bluecore's URLs within the imagery and words of the Emails sent to its subscribers and continued to intercept their interactions after being redirected to the Website.  When one of Defendant's customers receives an Email with Bluecore's URL and pixel tracking software, Bluecore detects the second an Email is opened and further intercepts any URLs anchored within the Emails' Content (*i.e.*, the images and words ***inside*** the Emails). As such, Bluecore is able to create, through its user interface, a replica of how Defendant's recipients are seeing and interacting with the Emails' Content in real time. From the moment they are sent, Bluecore stores a preview of Defendant's Emails and keeps a tally of the number of times Defendant's customers open and/or click on the URLs embedded within the Emails' Content, to further enhance Defendant's marketing while enhancing its machine learning capabilities. Below as an example of Defendant's Email including examples of its URL tracking and pixel ("bluecore-pixel")"

//

//

//

//

//

//

//

//

//

//

//

//

//

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19



20    //

21    //

22    //

23    //

24    //

25    //

26    //

27    //

28    //

41.     Bluecore operates on the Emails and Website in the manner alleged above.

42.     Through its Email and Website wiretaps, Bluecore intercepts, at minimum, the following information from all of Defendant's Email recipients and Website visitors:

(a) Emails: the time, place, device, geolocation, email address, and open rates and click rates of Emails (including what part of the Email's Content was clicked on);

(b) Website Sessions: "The timeframe of 30 minutes from the time a visitor lands on a website."

(c) Visits: "A series of customer interactions within your website that takes place across one or more tabs, while one of these are still active."

(d) User Engagement: "Campaign Seen: A customer has viewed the popup based on the previously configured display criteria."

(e) Date/Time: "The minimum number of minutes the customer has spent on the website.  This is calculated with every page load. Time spent can be further filtered by lifetime, session, or visit as explained in the visit frequency conditions."

(f) Campaign Engaged: "A customer has entered the required information into the popup.  For email capture Site campaigns, the campaign is engaged with when an email address is entered. For all other Site campaigns, the campaign is engaged with when it's clicked."

(g) Campaign Closed: "A customer has clicked out of or used the close button to dismiss the popup on-site."

(h) Cookie: "Checks for the cookies available in the customer's browser and matches them with the expected value configured in targeting. Only first-party cookies can be targeted here."

(i) Page scrolled: "Configure page scroll by percentage or pixels. Track customers who have scrolled a certain percentage/pixels of the website's page."

(j) Time spent: "Tracks the time the customer has spent on the current page. Curate a better user experience where an offer is not immediately triggered upon the customer's arrival to the site."

(k) User idle time: "Tracks the inactivity of the customer on the page. Display a promotion with this rule if a customer has spent X number of seconds without switching pages or scrolling."

(l) Has intent to leave: "Captures the exit intent of the customer to trigger a specific overlay to reduce page abandonment."

(m)New user: "A customer that is identified for the first time by the Bluecore Site™ JavaScript. Customers will remain in this state only when it's their first ever visit to a website."

(n) Returning user: "A customer who has been identified as a cookie, but Bluecore has not identified an email address to send marketing communications."

(o) Known user: "A customer who Bluecore has identified and the Bluecore Site™ JavaScript has captured an email address."

(p) Product Interaction: "New user: A customer that is identified for the first time by the Bluecore Site™ JavaScript. Customers will remain in this state only when it's their first ever visit to a website."[27]

43.    Plaintiff and the proposed class members received Defendant's Emails and accessed the Website through their internet browsers while in California. Upon having their browsers access the Emails and Websites in California, their browsers were intercepted by Bluecore's servers through the embedded URLs in the Emails and/or the JavaScript of the Website. Through this technology, Bluecore began tracking Plaintiff and the proposed class members' communications as they interacted with the Emails and the Website.

---

[27] https://help.bluecore.com/en/articles/3917362-bluecore-site-targeting-rules#url-based (last accessed October 21, 2024).

44.     Below is an illustration of how Bluecore works through Defendant's Emails and Website as discussed above:



45.     Here, the "HTTP 308" and "HTTP 302" symbols confirms that the URL link first lands on Bluecore's servers before being rerouted to Defendant's Website. Before doing so, however, the short (yet highly specific) URL links in the Emails permit Bluecore to obtain highly personal data (including the recipient's name and email as well the precise items clicked within the Email). With this information in hand, Bluecore further enhances its "out-of-the-box predictive models" from the "hundreds of brands" that use its software, including Defendant.  The final landing page confirms the above:

//

//

//

//

1

2

3

4

5

6

7

8

9

10

11

12



13

14

15

16

17

18

19

20

21

22

23



24

25        46.        When Plaintiff and the proposed class members accessed Defendant's Emails and

26    visited the Website, the contents of their communications – namely, the pieces of data alleged

27    above – were intercepted in real-time by Bluecore, as procured by Defendant. Bluecore then used

28

that data to create unique identifiers for each website visitor, including Plaintiff, and to target advertisements to Plaintiff and the proposed class members. Bluecore also retained and agglomerated this information to further enhance its proprietary algorithms, and subsequently provide statistical reports and presentations to attract new paying clients.

## CLASS ACTION ALLEGATIONS

47.     Plaintiff brings this action on behalf of himself and all other similarly situated persons pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), and (b)(3). The putative Class is defined as all persons within California who received and opened an Email from Defendant which caused their device to navigate to Defendant's Website (the "Class").

48.     Plaintiff reserves the right to amend the above class definitions and add additional classes and subclasses as appropriate based on investigation, discovery, and the specific theories of liability.

49.     ***Community of Interest***: There is a well-defined community of interest among Class members, and the disposition of the claims of these Class members in a single action will provide substantial benefits to all parties and to the Court.

50.     ***Numerosity:*** Members of the Class are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in the millions. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

51.     ***Commonality and Predominance***: Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to, whether Defendant has violated the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 631; and whether members of Class are entitled to actual and/or statutory damages for the aforementioned violations.

52.     ***Typicality.*** The claims of the named Plaintiff are typical of the claims of the Class because the named Plaintiff, like all other Class members, accessed Defendant's Emails, visited

the Website and had his electronic communications intercepted and disclosed to Bluecore—as enabled by Defendant—through the use of Bluecore's wiretaps.

53. ***Adequacy***. Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he is committed to prosecuting this action vigorously. The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

54. ***Superiority***: A class action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

(a) The expense and burden of individual litigation makes it economically unfeasible for members of the Classes to seek to redress their claims other than through the procedure of a class action;

(b) If separate actions were brought by individual members of the Classes, the resulting duplicity of lawsuits would cause members to seek to redress their claims other than through the procedure of a class action; and

(c) Absent a class action, Defendant likely would retain the benefits of its wrongdoing, and there would be a failure of justice.

## CAUSES OF ACTION

### COUNT I
**Violation of the California Invasion of Privacy Act**
**Cal. Penal Code § 631, *et seq.*, ("CIPA")**

55. Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

56. Section 631(a) of CIPA provides for damages and other relief against any person who "by means of any machine, instrument, contrivance, or in any other manner," did any of the following:

  a. Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any

telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;

*Or*

b.  Willfully and without the consent of all parties to the communication,or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state;

*Or*

c.  Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained;

*Or*

d.  Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

57.    Bluecore's tracking software (*i.e.*, the Email's URLs and Website's Javascript) is a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

58.    At all relevant times, by using Bluecore's tracking software, Bluecore willfully read or attempted to read or learn the contents or meaning of the Emails while the Emails were passing over a wire, line and/or cable, without consent.

59.    The information that Bluecore collected by using the highly detailed URL trackers in the Emails, as procured by Defendant, constitutes the "content" of Plaintiff's and the Class members' communications with the Emails and Website and arises to the level of common law invasion of privacy.  The embedded URLs convey the intended message within the Email communications because they permitted Bluecore to identify the exact image or text (*e.g.*, a specific shirt) that Plaintiff and the Class Members received and clicked on before their computers were redirected to the web page they originally sought to navigate to (*i.e.*, the exact subpage of the

precise items being clicked on within the emails). As such, Bluecore was able to identify the contents of Plaintiff and the Class Members' response to the Emails—*i.e.,* their intent to view, purchase or learn more about the exact items showcased in the Emails.

60.    Furthermore, through its pixel tracking software,  Defendant's allowed Bluecore to intercept the intended message that Defendant sent to Plaintiff and the Class Members by divulging the visual contents of the Emails the second an email was opened by permitting Bluecore to install pixels within the Email, thus permitting Bluecore to create a visual replica of the full visual template of those Emails stored on Bluecore's servers.

61.    In addition, after intercepting the URLs in the Emails, Bluecore's tracking software continued to track Plaintiff and the Class members' communication with the Website, as explained in greater detail above.

62.    Furthermore, Bluecore used or attempted to use the information resulting from its wiretap by providing this aggregated data to Defendant to enable it to learn deep insights, or otherwise enrich, its unknown user base, as explained in greater detail above. Bluecore's tracking software and contractual arrangements also permitted Defendant to track its known, and unknown, userbase after they logged off the Website while those users browsed their emails. *Davis v. Facebook, Inc. (In re Facebook Inc. Internet Tracking Litig.)*, 956 F.3d 589, 605-608 (9th Cir. 2020) (sustaining a common law invasion of privacy under California law and CIPA § 631(a) claim where the plaintiffs alleged that Facebook collected "a full-string detailed URL, which contains the name of a website, folder and sub-folders on the web-server, and the name of the precise file requested…[which] Facebook then correlates [] with the user ID, time stamp, browser settings and even the type of browser used.") (emphasis added); *see also In re Meta Pixel Healthcare Litig.*, No. 22-cv-03580-WHO, 2022 U.S. Dist. LEXIS 230754, at *36-37 (N.D. Cal. Dec. 22, 2022) (finding that the plaintiffs established a likelihood of success in their Wiretap and CIPA § 631(a) claims when Facebook tracked "descriptive URLs…[that] include both the 'path' and the 'query string'" that led to a particular webpage after a user clicked on a log in button on the website) (emphasis added); *see also In re Google RTB Consumer Priv. Litig.*, No. 21-cv-2155-

YGR, 2022 U.S. Dist. LEXIS 115023, 2022 WL 2165489, at *10 (N.D. Cal. June 13, 2022) (sustaining a ECPA Wiretap Act and CIPA § 631(a) claims against Google for disclosing to advertisers the "content" of the plaintiffs communications when navigating to particular websites, including the referrer URL that caused navigation to the website).

63.     Defendant aided, agreed with, and conspired with Bluecore to implement Bluecore's technology and to accomplish the wrongful wiretapping of the recipients of the Emails and visitors of the Website. In addition, Defendant employed Bluecore to accomplish its own wrongful wiretapping of the offline activity of its Website visitors, as detailed herein.

64.     Plaintiff and the Class members did not consent to any of Defendant's actions in implementing the wiretaps. Plaintiff and the Class members did not consent to Bluecore's access, interception, reading, learning, recording, and collection of Plaintiff's and the Class members' electronic communications.

65.     As a result of Defendant's violations of Section 632 of CIPA, Plaintiff and the Class members are entitled to damages, statutory damages, punitive damages, injunctive and declaratory relief, and attorney's fees and costs pursuant to Cal. Penal Code § 637.2.

**COUNT II**
**Violation of the California Invasion of Privacy Act**
**Cal. Penal Code § 635, *et seq.*, ("CIPA")**

66.     Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

67.     Section 635 of CIPA provides for damages and other relief against any person who:

    a.   Every person who manufactures, assembles, sells, offers for sale, advertises for sale, possesses, transports, imports, or furnishes to another any device which is primarily or exclusively designed or intended for eavesdropping upon the communication of another;

    *Or*

    b.   any device which is primarily or exclusively designed or intended for the unauthorized interception or reception of communications between cellular radio telephones;

c.  between a cellular radio telephone and a landline telephone in violation of Section 632.5;

*Or*

d.  communications between cordless telephones or between a cordless telephone and alandline telephone in violation of Section 632.6.

68.  At all relevant times, by implementing the Bluecore wiretaps, Defendant intentionally manufactured, assembled, sold, offered for sale, advertised for sale, possessed, transported, imported, and/or furnished a wiretap device that is primarily or exclusively designed or intended for eavesdropping and intercepting the communication of another.

69.  Bluecore's software code is a "device" that is "primarily or exclusively designed" for eavesdropping and intercepting communications. That is, the Bluecore Email URLs and Website Javascript trackers are designed to intercept and gather the contents of electronic communications, including Plaintiff and the Class members' replies to Defendant's Emails and subsequent visits to the Website, as well as their offline activity outside of the Website.

70.  Plaintiff and the Class members did not consent to any of Defendant's actions in implementing the Bluecore wiretaps detailed herein.

71.  As a result of Defendant's violations of Section 635 of CIPA, Plaintiff and the Class members are entitled to damages, statutory damages, punitive damages, injunctive and declaratory relief, and attorney's fees and costs pursuant to Cal. Penal Code § 637.2.

**<u>COUNT III</u>**
**Statutory Larceny**
**Cal. Penal Code § §§ 484 and 496**
**(On Behalf of Plaintiff and the Class)**

72.  Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

73.  Cal. Penal Code § 496(a) prohibits the obtaining of property "in any manner constituting theft."

74. Cal. Penal Code § 484 defines theft and provides:

> Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him or her, or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property, or who causes or procures others to report falsely of his or her wealth or mercantile character and by thus imposing upon any person, obtains credit and thereby fraudulently gets or obtains possession of money, or property or obtains the labor or service of another, is guilty of theft.

75. Cal. Penal Code § 484 thus defines "theft" to include obtaining property by false pretense.

76. Under California law, personal information constitutes property for the purpose of Cal. Penal Code § 496(a). *Calhoun v. Google LLC*, No. 20-CV-05146-LHK, 2021 U.S. Dist. LEXIS 54107, at *60-62 (N.D. Cal. Mar. 17, 2021) (collecting cases).

77. Cal. Civ. Code § 1798.140, defines personal information as "information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household," including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement."

78. The data that Defendant enabled Bluecore to collect from the computers of Plaintiff and the Class members—by implementing and using Bluecore's wiretaps on the Emails and Website—was aggregated to create consumer profiles, and their interactions with Defendant's Emails and Website constitutes personal information.

79. Defendant intentionally designed and implemented the Bluecore wiretaps unbeknownst to Plaintiff the Class members whose computers were thus deceived into providing personal information to Defendant.

80. Defendant acted in a manner constituting theft and/or false pretense.

81.     Defendant stole, took, and/or fraudulently appropriated Plaintiff and the Class members' personal information without their consent.

82.     Defendant concealed, aided in the concealing, sold, and/or utilized Plaintiff's and the Class members' personal information that was obtained by Defendant for Defendant's commercial purposes and the financial benefit of Defendant.

83.     Defendant knew that Plaintiff's and the Class members' personal information was stolen and/or obtained because Defendant designed or implemented the Bluecore wiretaps that tracked Plaintiff's and the Class members' personal information and operated it in a manner that was concealed and/or withheld from Plaintiff and the Class members.

84.     The reasonable and fair market value of the unlawfully obtain personal data can be determined in the marketplace.

### COUNT IV
**Violation of California Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL")**

85.     Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

86.     The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue, or misleading advertising." Cal. Bus. & Prof. Code § 17200. 409. Defendant is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

87.     Defendant violated the UCL by engaging in unlawful and unfair business acts and practices.

88.     Defendant's "unlawful" acts and practices include its violation of the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.*; California Invasion of Privacy Act, Cal. Penal Code §§ 635, *et seq.*; and California Statutory Larceny, Cal. Penal Code §§ 484 and 496.

89.     Defendant's conduct violated the spirit and letter of these laws, which protect property, economic, and privacy interests and prohibit unauthorized disclosure and collection of private communications and personal information.

90.     Defendant's "unfair" acts and practices include their violation of property, economic, and privacy interests protected by the: California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.*; the California Invasion of Privacy Act, Cal. Penal Code §§ 635, *et seq.*; and California Statutory Larceny, Cal. Penal Code §§ 484 and 496.

91.     To establish liability under the unfair prong, Plaintiff need not establish that these statutes were violated, although the claims pleaded herein do so.

92.     Defendant never obtained Plaintiff's or the Class members' permission to permit Bluecore to intercept or read their communications with the Emails or Website; nor did they permit Defendant to send their personal information to third parties, such as Bluecore, or the general public without their consent. Plaintiff and the Class members thus had no reason to know and could not have anticipated this intrusion into their privacy by the disclosure of their private communications with the Emails or the Website. Defendant acted in concert with Bluecore in violating the privacy expectations of Plaintiff and the Class members. Defendant's conduct was immoral, unethical, oppressive, unscrupulous, and substantially injurious to Plaintiff and the Class members. Further, Defendant's conduct narrowly benefitted its own business interests at the expense of Plaintiff's and the Class members' fundamental privacy interests protected by California's state laws.

93.     The wiretaps that Defendant concealed would be, and are, material to reasonable consumers, namely, that rather than not sharing the information contained within the Emails or the Website, that information was in fact shared with third parties, such as Bluecore.

94.     Plaintiff has suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendant's unfair and/or unlawful practices, to wit, the unauthorized disclosure and taking of his personal information which has value as demonstrated by its use and sale by Defendant. Plaintiff has suffered harm in the form of diminution of the value of his private and personally identifiable data and online activities. Defendant's actions caused damage to and loss of Plaintiff's property right to control the dissemination and use of his personal

information and communications.  Further, the information that Defendant intercepted from

Plaintiff was so extensive that it rises to the level of "property" theft under California's common

law and statutory larceny statute.  Plaintiff's and the Class members' email addresses enable them

to send and receive emails, are limited to the email provider's data storage plans, can be measured

when being used, and are unique to each user.  In engaging in the conduct set forth herein,

Plaintiff's property interest was diminished and he was deprived of property to which he has a

cognizable claim.

95.     Defendant reaped unjust profits and revenues in violation of the UCL. This

includes Defendant's profits and revenues from their targeted marketing campaigns.

96.     Defendant's unfair, fraudulent, and unlawful business practices, as enumerated and

explained above, were the direct and proximate cause of financial injury to Plaintiff and the Class

members. Defendant has unjustly benefitted as a result of its wrongful conduct.  Accordingly,

Plaintiff and the California Subclass seek an order of this Court that includes, but is not limited to,

requiring Defendant to: (a) provide restitution to Plaintiff and the Class members; (b) disgorge all

revenues obtained as a result of its violations of the UCL; (c) pay attorneys' fees and costs for

Plaintiff and the Class members.

97.     Plaintiff lacks an adequate remedy at law to address the unfair conduct at issue here.

Legal remedies available to Plaintiff and Class Members are inadequate because they are not

equally prompt and certain and in other ways efficient as equitable relief. Damages are not equally

certain as restitution because the standard that governs restitution is different than the standard that

governs damages. Hence, the Court may award restitution even if it determines that Plaintiff fails

to sufficiently adduce evidence to support an award of damages. Damages and restitution are not

the same amount. Unlike damages, restitution is not limited to the amount of money Defendant

wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles

Plaintiff to recover all profits from the wrongdoing, even where the original funds taken have

grown far greater than the legal rate of interest would recognize. Legal claims for damages are not

equally certain as restitution because claims under the UCL entail fewer elements. In short,

significant differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure; naming Plaintiff as representative of the Class; and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b)    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(c)    For compensatory, statutory and punitive damages in amounts to be determined by the Court and/or jury;

(d)    For prejudgment interest on all amounts awarded;

(e)    For an order of restitution and all other forms of equitable monetary relief; and

(f)    For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated: October 21, 2024                Respectfully submitted,

                                       **BURSOR & FISHER, P.A.**

                                       By: ___*/s/ L. Timothy Fisher*___

                                       L. Timothy Fisher (State Bar No. 191626)
                                       1990 North California Blvd., Suite 940
                                       Walnut Creek, CA 94596
                                       Telephone: (925) 300-4455
                                       Facsimile:  (925) 407-2700
                                       E-mail: ltfisher@bursor.com

                                       Joseph I. Marchese (*pro hac vice* forthcoming)
                                       Alec M. Leslie (*pro hac vice* forthcoming)
                                       New York, NY 10019

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: jmarchese@bursor.com
         aleslie@bursor.com

**GUCOVSCHI ROZENSHTEYN, PLLC.**
Adrian Gucovschi (*pro hac vice*)
630 Fifth Avenue, Suite 2000
New York, NY 10111
Telephone: (212) 884-4230
Facsimile: (212) 884-4230
E-Mail: adrian@gr-firm.com

*Attorneys for Plaintiff*